J-A05006-23

2023 PA Super 55

| | | |
|---|---|---|
| IN THE INTEREST OF: R.C.-G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.C.-C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2521 EDA 2022 |

Appeal from the Order Entered September 13, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000369-2022

BEFORE: LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

OPINION BY LAZARUS, J.: **FILED MARCH 31, 2023**

R.C.-C. (Father) appeals from the trial court's order adjudicating his daughter, R.C.-G. (Child) (born 5/08), dependent,[1] finding her to be the victim of child abuse, and concluding that the abuse was due to Father's failure to act. *See* 23 Pa.C.S.A. §§ 6303, 6381(d). After careful review, we affirm in part, vacate in part, and remand for further proceedings.

Father and Child are Guatemalan immigrants. Child is Spanish-speaking. Father speaks a Guatemalan dialect known as Q'eqchi'.[2] In April 2022, the Philadelphia Police Department received a third-party complaint

---

[1] Father concedes that the evidence supports a finding of dependency. *See* N.T. Adjudicatory/Child Abuse Hearing, 9/13/22, at 99-100; Father's Brief, at 10.

[2] Mother resides in Guatemala. She participated in the hearing, with the aid of an interpreter, via telephone.

alleging that Child was living with an adult[3] male, J.T., and that she was pregnant.[4] Officer Jose Viera of the Special Victim's Unit visited Child at the Winston Street, Philadelphia, residence listed in the complaint. Two men in their thirties answered the door and, at first, denied knowing Child. Officer Viera testified that Child then "came down the steps from the second floor" of the residence. N.T. Adjudicatory/Child Abuse Hearing, 9/13/22, at 29. Child confirmed her identity, pregnancy, and age (13 years old) to Officer Viera.[5] *Id.* at 31. Child also told Officer Viera that she had been living in the house with J.T. "prior to her 12th birthday," *id.*, and that she was not living with any family members in the residence. *Id.* at 32.

Following the officer's investigation, a Child Protective Services (CPS) report was generated alleging that Child was the victim of statutory sexual assault.[6] *Id.* at 55-56. Officer Viera transported Child to the Philadelphia

_____

[3] J.T. was 19-years-old at the time of the alleged incident.

[4] Child was also not attending school. In fact, school records show that Child was in school for only one month in 2020. N.T. Adjudicatory/Child Abuse Hearing, 9/13/22, at 58-59.

[5] Office Viera speaks Spanish. Once he determined that Child only spoke Spanish, he conversed with her in Spanish. *Id.* at 30.

[6] **See** 18 Pa.C.S.A. § 3122.1(a)(1) (statutory sexual assault defined, in relevant part, as "a person [who] engages in sexual intercourse with a complainant to whom the person is not married who is under the age of 16 years old and that person is either: **(1)** four years older but less than eight years older than the complainant[.]").

Department of Human Services (DHS)[7] where DHS investigator Serena Melendez interviewed Child, with the aid of a Spanish-speaking interpreter. Child reported to Melendez that she and Father moved to the United States from Guatemala three years ago, she had been dating J.T. for two years, and had been living with him "during that time." N.T. Adjudicatory/Child Abuse Hearing, 9/13/22, at 58. Child also told Melendez that "[F]ather was aware [that she had been dating J.T. and living with him] and he was okay with it." *Id.* Following the interview, DHS obtained an order of protective custody for Child and she was placed in foster care, where she currently resides. *Id.*[8]

Subsequently, Melendez interviewed Father with the aid of Father's Community Umbrella Agency (CUA) social worker, Benjamin Gamarra, who is Spanish-speaking. *Id.* at 60. Melendez testified that Gamarra "was able to translate [their] conversation," *id.*, and that during the interview:

> [Father stated he] was aware that [Child] was staying with J[.T.]
> However, he was concerned that she would be with somebody
> older, so he kind of seemed like it was okay. At first, he

---

[7] Under the Child Protective Services Law (CPSL) "[i]f the suspected child abuse is alleged to have been committed by a perpetrator and the behavior constituting the suspected child abuse may include a violation of a criminal offense, the appropriate county agency and law enforcement officials shall jointly investigate the allegation through the investigative team established in section 6365(c) (relating to services for prevention, investigation and treatment of child abuse) and as provided in this chapter." 23 Pa.C.S.A. § 6334.1(2).

[8] After speaking with Child, Melendez unsuccessfully attempted to contact Father by telephone. Melendez ultimately left Father a voicemail message, which Father returned three days later. Melendez testified that Child was unable to give her Father's specific address, merely relaying that Father lived "in South Philly." N.T Adjudicatory/Child Abuse Hearing, 9/13/22, at 71.

understood that in this country that that's not allowed. But[,] because he worked at night, and, you know, she was —it was kind of hard for him to supervise her, so, eventually, he came to an acceptance of her being with him.

*Id.* at 61. On cross-examination, however, Melendez acknowledged that she was unable to complete the interview with Father due, in part, to "some difficulty in translating the [interview in] full." *Id.* at 68-69. In fact, Melendez acknowledged that during the interview, Mr. Gamarra suggested that Melendez interview Father with a Q'eqchi' interpreter, *id.* at 69, but Melendez ultimately concluded that it was too "difficult to find someone who was either available or could speak the specific language Father speaks." *Id.*

DHS found the report indicated, listing Father as a perpetrator of child abuse,[9] pursuant to section 6303(b.1)(4) of the CPSL, where he "caus[ed] sexual abuse or exploitation of a child through any act/failure to act."[10] On

_____

[9] Father does not contest that Child was the victim of "sexual abuse or exploitation" as defined by the CPSL. *See* Father's Brief, at 10.

[10] Pursuant to section 6303, an "indicated report" is defined as:

(1) Subject to paragraphs (2) and (3), **a report of child abuse** made pursuant to this chapter **if an investigation by the department or county agency determines that substantial evidence of the alleged abuse by a perpetrator exists based on any of the following:**

(i) Available medical evidence.

(ii) **The child protective service investigation.**

(iii) An admission of the acts of abuse by the perpetrator.

*(Footnote Continued Next Page)*

- 4 -

September 13, 2022, the trial court held an adjudicatory/child abuse hearing[11] at which CUA case manager Joshua Hage, Officer Viera, DHS investigator Melendez, Father, and Child testified. A Q'eqchi' interpreter translated for Mother and Father, and a Spanish interpreter translated for Child at the hearing.

At the hearing, Child testified that at the time Officer Viera visited her in April 2022, she had known J.T. for two years and had been living with him for five months. N.T. Adjudicatory/Child Abuse Hearing, 9/13/22, at 42. Inconsistent with her prior statements to Melendez, Child testified at the hearing that she never told Father where she was living, *id.* at 45, and that when Father would ask where she was living, she would not tell him. *Id. See also id.* at 47 (Child testifying at hearing she did not recall telling Melendez that Father knew she was living with J.T. or that Father allowed her to live with J.T.). Father attempted to testify with the aid of a Q'eqchi' interpreter. However, Father's counsel quickly discontinued questioning, stating that she

_____

> (2) A report may be indicated under paragraph (1)(i) or (ii) for any child who is the victim of child abuse, regardless of the number of alleged perpetrators.

23 P.C.S.[A.] § 6303 (emphasis added). A perpetrator includes "[a] parent of the child." *Id.* Finally, a parent of the child may also be considered a perpetrator for failing to act. *Id.*

[11] DHS' counsel indicated at the hearing that counsel had stipulated to adjudicate Child dependent "based upon present inability with a full commit to D[]H[]S." N.T. Adjudicatory/Child Abuse Hearing, 9/13/22, at 26. The court's final order also permitted Father to have supervised, line-of-sight and line-of-hearing visits with Child at DHS. Order, 9/13/22, at 2.

"d[id]n't believe [she] c[ould] proceed" because Father was unable to understand her questions, despite the use of the interpreter. *Id.* 78. *See also id.* at 75-78 (counsel repeatedly having to restate and rephrase questions because Father was unable to understand questions, even with interpreter); *id.* at 77 (counsel stating, "Your Honor, I'm not confident that the interpretation is translating fair[ly]."). Following argument by counsel, the court stated on the record that it was adjudicating Child dependent, *id.* at 91, committing Child to the custody of DHS, *id.*, and that Child was the victim of child abuse due to Father's failure to act.[12] *Id.* at 100-01.

On appeal, Father presents the following issues for our consideration:

(1) Did the trial court err as a matter of law and abuse its discretion by finding Father to be a perpetrator of child abuse[,] pursuant to 23 Pa.C.S.[A.] § 6303(b.1)(4)[,] in the absence of clear and convincing evidence that Father acted with at least reckless intent, as required by the Child Protective Services Law?

(2) Can the trial court's finding of child abuse against Father be affirmed[,] pursuant to 23 Pa.C.S.[A.] § 6381(d)[,] in the absence of clear and convincing evidence that Child suffered abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent?

(3) Did the trial court err as a matter of law and abuse its discretion by allowing witnesses to testify as to the Child's hearsay statements over the objection of Father's counsel, and relying on those hearsay statements as substantive evidence?

Father's Brief, at 3.

_____

[12] The court also deemed J.T. a perpetrator of Child's abuse.

- 6 -

In ***In the Interest of La.-Ra. W.***, 266 A.3d 1071 (Pa. Super. 2021), our Court set forth the standard of review in child dependency cases as follows:

> Our scope of review in child dependency cases is limited in a fundamental manner by our inability to nullify the fact-finding of the trial court. We accord great weight to the hearing judge's findings of fact because the judge is in the best position to observe and rule upon the credibility of the witnesses. Given this unique posture, we will not overrule the findings of the trial court if they are supported by competent evidence and our well-settled standard of review "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the trial court's inferences or conclusions of law."

***Id.*** at 1089 (citation omitted).

"[Although] dependency proceedings are governed by the Juvenile Act (Act),[13] . . . the CPSL[14] . . . controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." ***In re L.V.***, 209 A.3d 399, 417 (Pa. Super. 2019) (citations omitted; ***see also In the Interest of X.P.***, 248 A.3d 1274, 1276 (Pa. Super. 2021) (same). The CPSL "does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child." ***In the Interest of J.R.W.***, 631 A.2d 1019, 1022 (Pa. Super. 1993). "[T]he Act and the [CPSL] must be applied together

---

[13] 42 Pa.C.S.A. §§ 6301-6475.

[14] 23 Pa.C.S.A. §§ 6301-6387.

in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the [Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated." *Id.* at 1023.

"'As part of [a] dependency adjudication, a court may find a parent [or caregiver] to be the perpetrator of child abuse[]' as defined by the . . . CPSL." *In re S.L.*, 202 A.3d 723, 728 (Pa. Super. 2019) (citation and quotations omitted). Section 6381 of the CPSL, which governs evidence in court proceedings, states that "[i]n addition to the rules of evidence . . . relating to juvenile matters, the rules of evidence in this section shall govern in child abuse proceedings in court[.]" 23 Pa.C.S.A. § 6381(a). Specifically, section 6381(d) "provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury . . . as **would ordinarily not be sustained or exist except by reason of the** acts or **omissions of the parent** or other person responsible for the welfare of the child." *J.R.W.*, *supra* at 1023 (emphasis added); 23 Pa.C.S.A. § 6381(d).

In *In the Interest of N.B.-A.*, 224 A.3d 661 (Pa. 2020), the Pennsylvania Supreme Court reiterated the appropriate standard of proof for a finding of child abuse:

> The requisite standard of proof for a finding of child abuse pursuant to [s]ection 6303(b.1) of the CPSL is clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations[.] 42 Pa.C.S.[A.] § 6341(c)[]. Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to

enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [] However, in certain situations, the identity of the abuser need only be established through *prima facie* evidence. As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, th[is] [C]ourt is not bound by the lower court's inferences or conclusions of law.

*Id.* at 668 (citations omitted). Moreover, in section 6831(d) cases where "the fact of abuse suffices to establishes *prima facie* evidence of abuse" by a parent, "a petitioning party is not required to establish that the parent perpetrated the abuse 'intentionally, knowingly[,] or recklessly.'" ***In the Interest of C.B.***, 264 A.3d 761, 773 (Pa. Super. 2021) (en banc).[15] ***See In the Interest of L.Z.***, ***supra*** at 1184 ("The Legislature [] carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is 'of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent[.]'").

_____

[15] Section 6381(d) provides:

> **(d) *Prima facie evidence of abuse.*** — Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).

Under section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by . . . [DHS] . . . and the rebuttal of the parent or responsible person.

*Id.* at 1185. **See id.** at 1176 n.15 (section 6381(d) presumption may be rebutted with evidence that parent or responsible person was absent at time of injury and not otherwise responsible for injury by failing to secure proper care for child); **see also In re S.L.**, 202 A.3d 723, 728 (Pa. Super. 2019) (section 6381(d) presumption "can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence") (citations omitted).

Father first claims that the trial court erred by finding that he was a perpetrator of child abuse, under section 6303(b.1)(4), when there was no clear and convincing evidence that he "acted with at least reckless intent."[16] Father's Brief, at 3. Father asserts that DHS was unable to prove that he was a perpetrator of child abuse where, due to the language barrier and lack of "appropriate interpreter services," he was unable to accurately convey to both

---

[16] Child abuse is defined, in relevant part, as "intentionally, knowingly or recklessly . . . [c]ausing sexual abuse or exploitation of a child through any act or failure to act." 23 Pa.C.S.A. § 6303(b.1)(4).

- 10 -

caseworker Melendez and the trial judge exactly what he knew with regard to Child's whereabouts and living arrangements with J.T. *Id.* at 11. We find that his argument has merit.

It is well-established, in the criminal context, that "[a] defendant's ability to use an interpreter encompasses numerous fundamental rights. The failure to understand the proceedings may deny him his right to confront witnesses against him, his right to consult with his attorney, or his right to be present at his own trial." *Commonwealth v. Pana*, 364 A.2d 895, 898 (Pa. 1976). To protect these rights, our Commonwealth has enacted the following statute:

> It is hereby declared to be the policy of this Commonwealth to secure the rights, constitutional and otherwise, of persons who because of a non-English speaking cultural background . . . are unable to understand or communicate adequately in the English language when they appear in court or are involved in judicial proceedings. It is the intent of this chapter to provide for the certification, appointment[,] and use of interpreters to secure the rights of person with limited English proficiency . . . in all judicial proceedings.

42 Pa.C.S.A. § 4401. "Judicial proceedings" are defined as "**[a]ny action**, appeal or proceeding **in any court of this Commonwealth**." *Id.* at § 4402 (emphasis added).

In *D.Z. v. Bethlehem Area Sch. Dist.*, 2 A.3d 712 (Pa. Cmwlth. 2010), our sister appellate court extended the right to interpretive services to non-criminal, administrative proceedings. There, the Commonwealth Court concluded that a hearing officer's decision to permit the mother of a disabled student to use an interpreter, whom she had requested, was not an abuse of

discretion. *Id.* at 721-22. Similarly, we conclude that Father, a non-English speaker, was also entitled to assistance from a competent interpreter during the juvenile court's proceedings. *See* 42 Pa.C.S.A. § 6338 (under Juvenile Act, party in juvenile matter entitled to opportunity to introduce evidence and otherwise be heard on his own behalf and cross-examine witnesses); *see also id.* at § 6301(b)(4) (one of stated purposes of Juvenile Act is "[t]o provide means through which the provisions of this chapter are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced"). Moreover, it logically follows that the right to use an interpreter assumes that the individual effectively interprets. *M.O. v. F.W.*, 42 A.3d 1068, 1072 (Pa. Super. 2012) ("The right of a litigant to in-court presentation of evidence is essential to due process[.]").

While the court purported to provide a Q'eqchi' interpreter for Father and went to great lengths to ensure that the interpreter could clearly hear counsel's questions,[17] it is nonetheless apparent that Father's interpreter did

---

[17] In particular, the trial judge: told counsel to repeat questions, "speak up," and spell words; asked remote parties to mute devices and background noises; asked parties to wait for the interpreter to finish interpreting before asking another question; and asked all parties to pause between questions and responses to allow interpreters to interpret. N.T. Adjudicatory/Child Abuse Hearing 9/13/22, at 14-77.

not successfully translate for him at the child abuse hearing.[18]  Quite literally, Father's testimony was "lost in translation."[19]  As a result, Father was unable to testify on his own behalf.  Under section 4401 of the Judicial Code, it was incumbent upon the court to provide a suitable interpreter for Father at the child abuse hearing so that he could testify and be given the opportunity to rebut the *prima facie* presumption[20] that he was a perpetrator of Child's abuse.

_____

[18] Although we recognize that the DHS investigation is not a "judicial proceeding" as defined in section 4402, we nonetheless would be remiss if we did not point out that Father was provided a *Spanish-speaking* interpreter during his interview with caseworker Melendez and that a Q'eqchi' interpreter was never afforded to Father throughout DHS' investigation—an investigation that ultimately led to an indicated CPS report.  ***See infra*** at n.11.  However, we also realize that different evidentiary standards govern agency determinations and judicial adjudications.  ***Compare J.F. v. Dep't of Human Servs***, 245 A.3d 658, 667 (Pa. 2021) (agency may enter "indicated report" of child abuse under substantial evidence standard) ***with Interest of J.M.***, 166 A.3d 408, 421-22 (Pa. Super. 2017) (child abuse must be proven by clear and convincing evidence).  The CPSL defines "substantial evidence" as "evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion."  ***See*** 23 Pa.C.S.A. § 6303.

It is axiomatic that without proof of Father's understanding and ability to communicate through the use of a Spanish-speaking interpreter, all of the conclusions and much of the testimony of the DHS investigators is suspect or at the very least unreliable.  We recognize the difficulty of providing an accurate Q'eqchi' translation, but due process requires no less.  We caution DHS to be cognizant of these difficulties, whenever communicating with a non-English speaking party.

[19] We also question the extent to which Father understood the testimony of the other witnesses, thus, potentially impacting any effective cross-examination on Father's behalf.

[20] To the extent that DHS contends Father presented rebuttal testimony, we disagree.  DHS states that Father's "rebuttal testimony . . . consisted simply

*(Footnote Continued Next Page)*

*See In re S.L.*, *supra* at 730 (finding of *prima facie* evidence against parent pursuant to section 6381(d) "did not end the analysis;" due process dictates parent entitled to present rebuttal evidence). *See also Pana*, *supra* at 898 (court's refusal to permit use of interpreter denied appellant right to testify effectively on own behalf and, thus, constituted prejudicial error).

We, therefore, conclude that the trial court abused its discretion by not ensuring that Father was provided an effective interpreter during the child abuse hearing and that, under these circumstances, it amounted to prejudicial error. *City of Phila. v. Pien*, 224 A.3d 71 (Pa. Cmwlth. 2019) (appellate court reviews trial court's decision to use interpreter for abuse of discretion). Father was denied the right to testify on his own behalf, a right that is especially vital where Father's credibility was a critical factor in the case.[21] *Pana*, *supra*.

---

of den[ying] that [Child] ever left his home and lived elsewhere." DHS' Brief, at 15. However, due to the ineffectiveness of the interpretation of Father's limited testimony, we do not agree that this was a reliable translation.

[21] The trial judge stated, at the conclusion of the hearing:

> The testimony today showed consistency between the testimony of Officer Viera, as well as the DHS social worker, Ms. Melendez. And this is as to relation of the interview of [Child], as well as with the interview of Father, **limited though it may have been**."
>
> I find that where there's a departure in [Child's] testimony, it's her attempt to protect her Father against a finding of child abuse.

N.T. Adjudicatory/Child Abuse Hearing, 9/13/11, at 100 (emphasis added).

Thus, we vacate that portion of the court's order finding Father is a perpetrator of child abuse, and remand for a new child abuse hearing, to be held within 60 days of the date of this decision. At that hearing, Father is to be provided with an effective/accurate interpreter so that he has the opportunity to meaningfully testify and present section 6381(d) rebuttal evidence.[22] Whether or not Father's rebuttal evidence is credible or persuasive is within the trial court's ultimate purview. *In re S.L.*, *supra*.[23]

Order affirmed in part and vacated in part. Case remanded with instructions.[24] Jurisdiction relinquished.[25]

---

[22] Although this result may prolong Child's permanency placement, we note that Child is in a Spanish-speaking foster home where she is thriving and which may be an adoptive resource.

[23] Because we have remanded for a new hearing, Father's final issue regarding the admissibility of alleged hearsay statements is moot.

[24] Our decision today does not downplay or disregard a parent's fundamental duty to protect one's child, a duty that necessarily includes knowing the whereabouts and living arrangements of his or her minor child.

[25] Father also claims that because the section 6381(d) presumption was "not raised or litigated at trial," the presumption did not make any of the "factual findings necessary to apply the presumption." Father's Brief, at 27. In *In La.-Ra. W.*, *supra*, our Court found that the presumption is "self-executing where DHS' evidence clearly and convincingly provided the requisite elements under section 6381(d) and where Parents were given the opportunity to present rebuttal evidence[.]" *Id.* at 1081.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/31/2023</u>