J-S15014-24
J-S15015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: X.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2332 EDA 2023 |

Appeal from the Order Entered August 15, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000538-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: X.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2696 EDA 2023 |

Appeal from the Order Entered August 15, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000538-2023

BEFORE: OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.: **FILED JUNE 12, 2024**

C.R. ("Father") and A.A. ("Mother") (collectively, "Parents") separately

appeal from the August 15, 2023 order adjudicating their son, X.R. ("Child"),

born in May 2022, dependent, finding that Child was a victim of "child abuse,"

---

[*] Retired Senior Judge assigned to the Superior Court.

and concluding that they were the perpetrators of the abuse.[1]  23 Pa.C.S.A. §§ 6303(b.1), 6381(d).  After review, we affirm.

On May 15, 2023, then one-year-old Child presented to the Emergency Room at St. Christopher's Hospital for Children ("St. Christopher's") unresponsive with head injuries after reportedly falling out of a Pack 'n Play. N.T., 8/15/23, at 16; *see also id.* at 47-48; *see also* Exhibit DHS-6 (St. Christopher's medical records).

Upon examination by the Emergency Department, initial concerns were of altered mental status,[2] as well as seizure activity.  N.T., 8/15/23, at 44-45. Dr. Michelle Dominguez ("Dr. Dominguez"), an attending physician in child abuse pediatrics and member of the Child Protection Program at St. Christopher's, examined Child upon referral from the Emergency Department. According to Dr. Dominguez, imaging revealed:  "significant bleeding into the subdural space, so the lining around his brain.  . . .  So that's bleeding under the skull, essentially on top of the surface of the brain."  *Id.* at 45.  Child was intubated and treated with hypertonic saline, which is utilized for brain swelling, as well as seizure medication.  *Id.* at 47-48, 51.

_____

[1] We have *sua sponte* consolidated Mother's and Father's appeals, as the orders appealed and questions involved are essentially the same. **See** Pa.R.A.P. 513 (consolidation of multiple appeals).

[2] Child "was not active the way he should be at that age.  He was not interactive.  He did[, however,] respond to pain. . . ."  N.T., 8/15/23, at 47-48.

Ultimately, Child was found to have suffered near-fatal injuries. *Id.* at

57, 64. Dr. Dominguez testified:

> [H]e had bilateral subdural hemorrhages, so that's both sides of the head. What we could see on the initial head CT, the initial head imaging, was bleeding to the front of the left side that extended to the side of the head; blood along the falx, which is membrane that separates [the] two sides of the head. And then, over time we could see additional bleeding, essentially on both sides of the head.
>
> He also had -- on the spine, we could see subdural blood from the -- I believe it was T10 to L5 level, so like mid back to -- to the lower back, which may just be drainage from the subdurals in the brain.
>
> He had retinal hemorrhages . . . to the backs of both eyes, too many to count, essentially covering the entirety of both retinas, so pretty severe retinal hemorrhages.

*Id.* at 59-60; *see also id.* at 45, 55-57, 72, 76; *see also* Exhibit DHS-6 (St.

Christopher's medical records). Child additionally had "bruising across his

forehead, in two different areas," and was "seizing on and off for three days,"

also potentially fatal. N.T., 8/15/23, at 48, 64 ("Brain injury itself is fatal at

this level. And ongoing seizure activity can also -- status epilepticus, as it's

called, when you seize and you can't stop, that can also be fatal.").

Given the extent of Child's injuries, Dr. Dominguez testified that she

would expect Child to have been "immediately symptomatic." *Id.* at 60

("[W]hen we see this level of intercranial injury, I would expect that he would

have been immediately symptomatic. When a child has this level of injury,

they don't appear to be normal after it happens."). Moreover, she stated,

"[I]t's hard to speak definitely to prognosis, but I would say I expect injuries

like this to have a longstanding effect. . . . I expect . . . [Child] would need

extensive therapies to ensure he regains function." *Id.* at 63. She explained:

> [F]or instance, when -- when he was in the hospital, he was not able to eat. Even after he was X-rayed, he was irritable, but he wasn't acting normally. He had . . . decreased muscle tone in his body, increased tension in his arms and legs. He lost function. He was not the same level of function he was when he came in. And when you have this level of damage to the brain, and the retinal hemorrhages in the back of the eyes, you can have issues with sight. Some children don't see after this kind of injury or have sight impairment. You can see very longstanding developmental delays essentially.

*Id.* at 63-64.

With respect to Parents' explanation of Child's injuries, DHS social work

service manager, Tierra Dunn ("Ms. Dunn"), who investigated the incident,

testified:

> [Parents] were home with [Child and his brother, C.R.[3]], that they had just got finished eating and they had [given them] their bottles. It was reported that [Parents] took the children upstairs to put them in their Pack 'n Play and crib. Specifically, [Child] was in a Pack 'n Play and [C.R.] was in his crib, which are both in the same bedroom, and they're like catercorner [sic] to each other. [P]arents' bedroom is attached to the children's room . . . . Father said that he . . . went downstairs to clean up. Mother was in [P]arents' room. She reported that she heard a thump, so she ran into the boys' room, and she found [Child] on his back, I believe, and he was crying, screaming, yelling. Mother picked him up. She said she immediately saw swelling going across his forehead, swelling of his head, and then she called for Dad to come back upstairs. I believe he was coming back upstairs because he heard the thump as well. So when he got back upstairs, he also was observing the swelling of his head. Dad then went back downstairs to get some ice for [Child]. And as he was

_____

[3] C.R., almost two years old at the time of the subject hearing, is not a subject of the instant appeals.

going downstairs, it was reported by Mother that [Child] was going in and out of consciousness, that his lips were turning blue. And then she had called for Father to come back upstairs. . . . [T]hey called 911. 911 instructed them to complete CPR, so they completed CPR until the medics arrived, and [Child] was taken away to St. Chris[topher's].

*Id.* at 17-19.[4]

Significantly, there is no dispute that Child was in the sole care of Parents at the time of the incident. *Id.* at 21. In short, Parents alleged that Child pulled himself up to a standing position in the Pack 'n Play and then fell over and hit his head. *See id.* at 77-78.

Dr. Dominguez opined that Child's injuries were not consistent with the accident mechanism provided by Parents. *Id.* at 52-53. Specifically, while acknowledging that Child "could pull to stand,"[5] Dr. Dominguez stated that Child's injuries "were not consistent with a fall from a Pack 'n Play." *Id.* at 54, 56; *see also id.* at 61-62 ("I have seen many falls in the course of my career of 3-foot from Pack 'n Plays, from other surfaces like beds. The most -- usually, you will see -- the most common injury is no injury at all. Children fall all the time, and most of the time nothing happens. . . .); *see also id.* at 77-78 (recognizing the possibility of a fall from a Pack 'n Play where Child

---

[4] Parents' version of the incident remained unchanged. *See* Exhibits DHS-3 & 6 (DHS report and St. Christopher's medical records); *see also* N.T., 8/15/23, at 46-47, 92-93.

[5] Dr. Dominguez clarified, "[W]hen I say pull to stand, I mean that they can put their hands on something and get their feet under them." *Id.* at 73.

- 5 -

would hit his head but, stating, "I would not expect a fall even with hitting his head against a hard object to cause this clinical picture, with his injuries, no.").

Rather, Dr. Dominguez explained that such injuries are instead consistent with a "rotational acceleration/deceleration mechanism, so something that caused his -- his brain and eyes to move in a different direction than his skull. We can see those types of axonal injuries in, for instance, falls down the stairs in a caregiver's arms, where there's -- where there's force, where there's more weight than the child's own weight, [roll-over] car accidents, among other[s]." *Id.* at 56; *see also id.* at 59.

Dr. Dominguez reported that tests were conducted and revealed no other medical reasons for Child's injuries. *See id.* at 50. Further, although Child was born prematurely, Dr. Dominguez testified that this would not contribute to his injuries ("I would not expect that a one-year-old otherwise healthy child would have any increased likelihood of these injuries from a fall simply due to prematurity previously."). *Id.* at 55. As a result, Dr. Dominguez opined that Child suffered head trauma as a result of child physical abuse. *Id.* at 58.

A Child Protective Services ("CPS") report detailing the alleged abuse and naming Parents as alleged perpetrators was generated. This report was ultimately indicated. *Id.* at 16-17, 26; *see also* Exhibit DHS-3 (DHS report).

On June 20, 2023, DHS filed a dependency petition, wherein it alleged that Child was dependent and/or abused pursuant to the Juvenile Act,

42 Pa.C.S.A. § 6302 (Dependent Child who is without proper care or control) and/or the Child Protective Services Law (CPSL), 23 Pa.C.S.A. § 6303(b.1) (defining "Child Abuse"). The court conducted an adjudicatory and child abuse hearing on August 15, 2023. Parents were present and represented by separate counsel.

DHS presented the testimony of Ms. Dunn; Dr. Dominguez, a stipulated expert in pediatric child abuse; Mother; Destiny Vargas-Febles, Community Umbrella Agency ("CUA") case manager; and Tyeesha Grasty, CUA case manager supervisor. DHS additionally offered Exhibits DHS-1 through DHS-6, which were admitted without objection. N.T., 8/15/23, at 8-11. Mother presented Exhibit Mother-1, which was admitted without objection. *Id.* at 33. Father did not testify or offer any evidence.

At the conclusion of the testimonial evidence, the trial court adjudicated Child dependent. In addition, the court found that Child was a victim of "child abuse" perpetrated by Parents and converted the CPS report from indicated to founded. *Id.* at 124-126. By order of adjudication and disposition dated and entered on August 15, 2023, the court memorialized its findings.

Parents filed separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), on September 12 and 14, 2023, respectively. The trial court filed a responsive Rule 1925(a) opinion on November 17, 2023.

On appeal, Father presents the following issue for our review, "Whether the trial court erred as a matter of law or abused its discretion when it determined that [Child] was the victim of child abuse, and that [Father] was responsible for that abuse?" Father's Brief at 3. Similarly, Mother presents the following issue for our review, "Did the trial court err and abuse discretion by finding that DHS proved by clear and convincing evidence that [Mother] was a perpetrator of child abuse against [Child] either by action or omission?" Mother's Brief at 5.

We set forth the applicable standard of review and law in **In the Interest of G.R.**, 282 A.3d 376, 380-382 (Pa. Super. 2022), as follows.

> We review this appeal for an abuse of discretion. **In the Interest of L.Z.**, 111 A.3d 1164, 1174 (Pa. 2015). "The standard of review in dependency cases 'requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law.'" **Id.** (citation omitted).
>
> "[Although] dependency proceedings are governed by the Juvenile Act (Act), . . . the CPSL . . . controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." **In re L.V.**, 209 A.3d 399, 417 (Pa. Super. 2019) (citations omitted []); **see also In the Interest of X.P.**, 248 A.3d 1274, 1276 (Pa. Super. 2021) (same). The CPSL "does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child." **In the Interest of J.R.W.**, 631 A.2d 1019, 1022 (Pa. Super. 1993). "[T]he Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the [Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated." **Id.** at 1023.

"'As part of [a] dependency adjudication, a court may find a parent [or caregiver] to be the perpetrator of child abuse[]' as defined by the . . . CPSL."[6] ***In re S.L.***, 202 A.3d 723, 728 (Pa. Super. 2019) (citation and quotations omitted). Section 6381 of the CPSL, which governs evidence in court proceedings, states that "[i]n addition to the rules of evidence . . . relating to juvenile matters, the rules of evidence in this section shall govern in child abuse proceedings in court[.]" 23 Pa.C.S.A. § 6381(a). Specifically, section 6381(d) "provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury . . . as would ordinarily not be sustained or exist except by reason of the **acts or omissions** of the parent or other person responsible for the welfare of the child." ***J.R.W.***, ***supra*** at 1023; 23 Pa.C.S.A. § 6381(d) (emphasis added).

In ***In the Interest of N.B.-A.***, 224 A.3d 661 (Pa. 2020), the Pennsylvania Supreme Court recently reiterated the appropriate standard of proof for a finding of child abuse:

> The requisite standard of proof for a finding of child
> abuse pursuant to [s]ection 6303(b.1) of the CPSL is

---

[6] Section 6303 of the CPSL defines "child abuse" as follows, in relevant part:

**§ 6303. Definitions.**

. . .

**(b.1) Child abuse**.-- The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

(1) Causing bodily injury to a child through any recent act or failure to act.

. . .

23 Pa.C.S.A. § 6303(b.1)(1).  "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain.  23 Pa.C.S.A. § 6303(a) ("Bodily injury").  Parents do not appear to challenge that Child's injuries meet the definition of child abuse.

clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S.[A.] § 6341(c)[]. Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [] However, in certain situations, the identity of the abuser need only be established through prima facie evidence. As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, th[is] [C]ourt is not bound by the lower court's inferences or conclusions of law.

*Id.* at 668 (citations omitted).

Section 6381(d) of the CPSL establishes a rebuttable, evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party.[7] Under such circumstances, "the fact of abuse suffices to establish prima facie evidence of abuse by the parent or person responsible." ***In the Interest of L.Z.***, ***supra*** at 1167. ***See id.*** at 1184 ("The Legislature [] carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on prima

---

[7] Section 6381(d) provides:

**(d) *Prima facie evidence of abuse*.** — Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d). *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *L.Z.*, 111 A.3d at 1184 (citing Black's Law Dictionary 825 (6th ed. abridged 1991)).

facie evidence in cases where the abuse is "'of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent[.]'").

Under section 6381(d), a parent or other responsible caregiver may rebut the prima facie presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the prima facie evidence presented by . . . [DHS] . . . and the rebuttal of the parent or responsible person.

*Id.* at 1185. *See id.* at 1176 n.15 (section 6381(d) presumption may be rebutted with evidence that parent or responsible person was absent at time of injury and not otherwise responsible for injury by failing to secure proper care for child); *see also In re S.L.*, 202 A.3d 723, 728 (Pa. Super. 2019) (section 6381(d) presumption "can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence") (citations omitted).

*G.R.*, 282 A.3d at 380-382 (some brackets in original) (footnotes omitted);

*see also C.B.*, 264 A.3d 761, 770-772 (Pa. Super. 2021).

Instantly, the trial court deemed Parents perpetrators of child abuse, concluding that the medical evidence established that Child suffered near-fatal injuries while in the care of Parents without sufficient explanation. Thus, the court applied the rebuttable presumption under Section 6381(d). Specifically, the court found:

> Th[e trial] court found both Ms. Dunn's and Dr. Dominguez's testimony to be credible and that Dr. Dominguez had been stipulated to as an expert in the area of pediatric child abuse.

(N.T., 8/15/23, at 124). The court found that Child suffered a life-threatening injury. Child had suffered a bilateral subdural hemorrhages which is bleeding on the brain on two separate locations, retinal hemorrhages, and seizures. All the testimony was basically the same in regard to what happened to Child provided by Father and Mother. Dr. Dominguez's testimony was that Father's and Mother's explanation of what happened would not equate to the child suffering those injuries. It was Dr. Dominquez's expert opinion that Child had suffered abusive head trauma and his injuries were the result of child physical abuse. There was no evidence provided or testimony elicited that would provide another reasonable explanation for how these injuries occurred. When asked on cross-examination if this injury could have happened if Child had fallen on his own out of the Pack 'n Play and hit his head on his brother's crib, Dr. Dominguez specifically [said] that it could not. Dr. Dominguez's testimony essentially ruled out any other possibility of how Child suffered his injuries. Accordingly, Dr. Dominguez concluded within a reasonable degree of medical certainty that Child's injuries are consistent with physical child abuse. (N.T., 8/15/23, at 58).

Based on all these reasons, the court found DHS met its burden by clear and convincing evidence that Child suffered child abuse. The court also found that Father and Mother were the primary caregivers and responsible for the welfare of Child at the time of his injuries. Therefore, the court found Mother and Father as the perpetrators of child abuse to Child.

Trial Court Opinion, 11/17/23, at 10-11 (cleaned up).

However, on appeal, Parents assail the trial court's finding that they were the perpetrators of child abuse by act or omission. Specifically, they claim that the evidence was insufficient to prove that they harmed Child by acting "intentionally, knowingly, or recklessly," or by failing to act.[8] **See** Father's Brief at 17-18; Mother's Brief at 8. In so doing, Parents ignore and

---

[8] For purposes of the CPSL, the terms "intentionally," "knowingly," and "recklessly" have the same meaning as set forth in 18 Pa.C.S.A. § 302. 23 Pa.C.S.A. § 6303(a).

wholly disregard the trial court's application of Section 6381(d). Further, Father expressly states, in part, "The trial court did not cite to Section 6381(d), nor did it engage in any Section 6381(d) analysis." Father's Brief at 16. This argument is without merit as aptly stated by Child in his appellate brief as follows.

> This last statement—that the [t]rial [c]ourt did not cite to Section 6381(d) or analyze the facts under it—is simply inaccurate. On page five of its Opinion, the [t]rial [c]ourt cites Section 6381(d) and reproduces its text in full. It further cites [**In re L.Z.**, 111 A.3d 1164 (Pa. 2015)], the seminal Pennsylvania Supreme Court case interpreting this provision, and clearly articulates the relevant standard for a determination of child abuse under this subsection—that the "existence of child abuse must be found by clear and convincing evidence but the identity of the abuser need only be established through prima facie evidence"; that the section "applies if the abuse is of a nature that would ordinarily not be sustained or exist except by reason of the acts of the parent and that the parent is proved to have had responsibility for the welfare of the child at the time of abuse"; and that "proof of the nature of the child's harm, alone is prima facie evidence of child abuse by anyone who is found to be responsible for the welfare of the child at the time of the alleged injuries." Trial Ct. Op. [at] 5. It then proceeds to analyze the facts established at trial in the context of this framework. See Trial Ct. Op. [at] 6-11.

Participant's Brief (Father's appeal) at 27-28.[9]

_____

[9] Regardless, the Section 6381(d) presumption is self-executing, and, therefore, applicable. **See In the Interest of La.-Ra. W.**, 266 A.3d 1071, 1081 (Pa. Super. 2021) ("Instantly, we agree with DHS that the presumption is self-executing where DHS's evidence clearly and convincingly provided the requisite elements under section 6381(d) and where Parents were given the opportunity to present rebuttal evidence through expert witnesses . . . .") (citation omitted).

Applying Section 6381(d) as set forth above to the case at bar, we affirm the trial court's determination that Parents were the perpetrators of child abuse. Indeed, clear and convincing evidence exists in the record demonstrating that Child suffered a non-accidental, near-fatal head injury. Specifically, it is undisputed that Child suffered, *inter alia*, subdural hemorrhages to both sides of his head, subdural blood on the spine, retinal hemorrhages, and persistent seizures while in the sole care of Parents. **See** N.T., 8/15/23, at 21, 48, 54-57, 59-60, 76; **see also** Exhibit DHS-6. Dr. Dominguez testified unequivocally that such injuries were not self-inflicted and were not the type that would result from a fall from a Pack 'n Play, as reported by Parents. **See** N.T., 8/15/23, at 52-53. Thus, the medical evidence presented by DHS demonstrated that Child suffered traumatic brain injuries that "would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child[.]" 23 Pa.C.S.A. § 6381(d). We therefore conclude that the trial court properly determined Child suffered child abuse and applied the Section 6381(d) presumption to Parents. **See G.R.**, 282 A.3d at 382-383; **see also C.B.**, 264 A.3d at 777.

Moreover, we discern no error by the court in finding that Parents failed to rebut the presumption that they were the perpetrators inasmuch as Child was in their sole care at the time of the incident, and Dr. Dominguez, whom the court found credible, testified that Parents' explanation of the incident did

not account for Child's injuries. *See L.Z.*, 111 A.3d at 1180 (Section 6381(d) presumption can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence); *see also* N.T., 8/15/23, at 21, 52-53. Notably, on cross-examination, while conceding that Child could have pulled himself to stand, fallen from the Pack 'n Play, and hit his head, Dr. Dominguez rejected that this causal scenario could have caused Child's injuries. *See* N.T., 8/15/23, at 77-78.

As Father failed to testify or present any evidence and his counsel merely cross-examined DHS's witnesses, we are constrained to conclude that Father failed to rebut the presumption. *See G.R.*, 282 A.3d at 385 ("[W]here the trial court deemed DHS's witnesses credible, Mother and Father did not testify, and no rebuttal witnesses were presented to offer countervailing testimony, we are constrained to affirm the trial court's determination.").

Mother likewise failed to rebut the presumption. To the extent she did offer testimony, Mother merely repeated the narrative that Child fell from a Pack 'n Play. *See* N.T., 8/15/23, at 92-93. We discern no abuse of discretion by the court in crediting Dr. Dominguez's opinion that Mother's explanation of Child's injuries was not plausible based on their nature and severity. Thus, we conclude that the trial court properly found Parents were the perpetrators of abuse pursuant to Section 6381(d).

Given the applicability of Section 6381(d), Parents' argument that the record is devoid of evidence that they were perpetrators of child abuse by any

intentional, willful, and/or reckless act or failure to act is without merit. ***See***

***C.B.***, 264 A.3d at 773 ("[I]n section 6381 cases, 'the fact of abuse suffices to

establish *prima facie* evidence of abuse by the parent or person responsible,'

permitting petitioners to 'prove their case **with only the physical evidence**

**of injuries that would not ordinarily be sustained but for the action**

**[or inaction] of the parents or responsible persons** and the **implausible**

**statements** of the parents and responsible persons.'") (citations omitted)

(emphasis in original).

 Based on the foregoing, we affirm the trial court's order.

 Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/12/2024</u>